IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARIE CANGE                              :              CIVIL ACTION
                                         :              NO. 08-3480
        v.                               :
                                         :
PHILADELPHIA PARKING                     :
AUTHORITY                                :

O'NEILL, J.                                             October 30, 2009


MEMORANDUM

Plaintiff Marie Cange filed a complaint against her former employer, defendant

Philadelphia Parking Authority, alleging discrimination based on her national origin in violation

of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000d and 2000e, the

Civil Rights Act of 1991, Pub. L. 102-166, 105 Stat. 1071 (Nov. 21, 1991), and the Pennsylvania

Human Relations Act, 43 Pa. Stat. § 951 et seq.  Both parties have moved for summary

judgment.


BACKGROUND[1]

Plaintiff was born in Haiti and moved to the United States in 1980.  Her first language is

French and she speaks English with a heavy accent.  She came to Philadelphia in 1988 and

worked for nineteen (19) years as a cashier at the Philadelphia International Airport.  After

numerous ownership changes of the airport's parking operations, she eventually came to be

employed by the Parking Authority in November 2004.  While employed by defendant she

received one verbal warning for having a shortage of funds in her cash drawer, but received no

disciplinary action against her until the one leading to her termination.  Her one performance

---

[1]        The following facts are not in dispute unless indicated.

evaluation conducted by defendant shows she received "satisfactory" to "above average" reviews in all categories.

When defendant assumed control of the parking operation at the Airport, plaintiff along with the other employees of the prior operator became an employee of defendant. The change in control did not affect plaintiff's job title or responsibilities. As part of the change, plaintiff and all of the other employees were required by defendant to complete certain personnel forms. She stated on the Human Resources Information Form that her "ethnicity" is African-American. On the Personnel Data Summary, she indicated "HAITI" where it requested "Name and Location of Educational Institution." Plaintiff and all of the other employees were also required to present "proof of citizenship or one of the following INS issued documents, U.S. citizen ID Card (INS Form I-197), Resident Citizen of the United States (INS form I-179)." Plaintiff presented her passport which indicates Haiti as her country of birth. Plaintiff's personnel file, which included the Personnel Data Summary form, was maintained by defendant's Human Resources Department which included Mr. William Raymond. Raymond "processed" plaintiff when defendant took over the airport parking operations.

Plaintiff was a member of and was represented by the Teamsters Local 115 union. She also was a shop steward for Local 115. Union employees like plaintiff were protected by a Collective Bargaining Agreement ("CBA") which provides that union employees may only be disciplined or discharged for "just cause."

Defendant's Cashier Standard Operating Procedures entitle a cashier to a thirty minute lunch break and two fifteen minute breaks during each eight hour shift with the first break required to be taken in the first half of the shift and the second break during the second half. The

2

Standard Operating Procedures instructs cashiers on how to perform a "Partial End of Shift" function ("partialing out") on their computer terminals before beginning a break.  Partialing out registers the start of the cashier's break in defendant's computer system.

Defendant's Standard Operating Procedures' Code of Conduct lists sixty-nine (69) different rules which if violated "may be considered grounds for disciplinary action up to and including termination."  Specifically, it provides, "NO EMPLOYEE SHALL: . . . 44. Sleep or loaf while on duty."  Defendant's Employee Manual describes progressive disciplinary actions which may be taken against an employee but also states,

> The disciplinary progression just described is illustrative only.  Steps in the progression may be omitted if the violations are serious in that they jeopardize the safety of employees or the public, undermine the credibility or reputation of the Authority or create a disruption of the workplace.  Some violations are so serious they require immediate suspension with intent to terminate the employee.  The following serious violations may lead to immediate termination: . . . 10. Sleeping on duty.

Plaintiff was aware that pursuant to both the Employee Manual and the Standard Operating Procedures she could be terminated for sleeping while on duty.

Defendant monitors its cashiers with video surveillance; the videotapes are reviewed at random by Video Examiners who prepare Video Incident Reports any time they observe a violation of Standard Operating Procedures.  The Manager of Airport Operations reviews Video Incident Reports and related tapes and along with the Director of Airport Operations will

3

determine the appropriateness of disciplinary action.

On September 12, 2006, plaintiff worked two eight-hour shifts. She did not take her first fifteen minute break. There was no supervisor on duty at the time she took her lunch break. Plaintiff states that her lunch break was supposed to start at 4:00 a.m. per a conversation she had with her co-worker that night, Kim Earland, and Earland was to take her lunch at 4:30 a.m. Video surveillance shows plaintiff with the lights on in her booth and her eyes closed from approximately 4:01 a.m. to 4:04 a.m. At 4:04 a.m. plaintiff "partialed out" which registered in defendant's computer the start of her lunch break. While still on her lunch break plaintiff slept for approximately three minutes beginning at 4:22 a.m. She signed back in on the computer at 4:38 a.m. which marked the end of her lunch break. The video surveillance also shows plaintiff with either her chin or face on the table in her booth for about 21 seconds at 3:24 a.m.[2]

A Video Examiner reviewed the video surveillance tape from the night of plaintiff's shift and prepared a Video Incident Report on September 19, 2006 which stated that plaintiff was "asleep off and on between 4 & 5 AM and during rest of shift. Note (Cashier working double!)" The Report was transmitted to the Manager of Airport Administration, Joseph Boschetti, who states in his affidavit that he reviewed the video tape and determined that plaintiff was sleeping at various times while on duty between 3:00 a.m. and 5:00 a.m.[3] Boschetti discussed the matter

---

[2]      The parties do not dispute that plaintiff was on duty at this time, but there is a dispute as to whether plaintiff was asleep and whether, if she was asleep, this was a factor considered by defendant in terminating plaintiff

[3]      Plaintiff argues that I may not rely on the affidavit of Boschetti, the deposition testimony of Raymond, or any other statements by "interested witnesses," citing Hill v. City of Scranton, 411 F.3d 118, 131 n. 22 (3d Cir. 2005) and Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 149-151 (2000). In Hill, the Court of Appeals stated, "when drawing all reasonable inferences in favor of the non-movant [for the purposes of summary judgment] the

with the Director of Airport Operations, Frank Ragozzino, who also concluded plaintiff was

sleeping or loafing while on duty.  Ragozzino and Boschetti jointly recommended that plaintiff

be suspended immediately with intent to terminate.

An Employee Report was issued on September 20, 2006, and signed by Ragozzino and

Raymond along with Wren Giddare, Supervisor, and Carl Ciglar, On-Street Director.  The report

states,

> FACTS: On Tuesday, September 12, 2006 you were observed on
>
> security cameras sleeping in the cashier booth in lane 71.
>
> ACTION TAKEN: You are charged with conduct unbecoming a PPA
>
> employee; failure to complete job duties, and sleeping or loafing
>
> while on duty.  You are hereby suspended with the intent to dismiss
>
> effective immediately . . . .
>
> SUPERVISOR'S  COMMENTS  (OPTIONAL):  refused  to  sign
>
> 9/20/06 @ 2:00 pm

Boschetti handed plaintiff the Employee Report on September 20 in Giddare's presence.

Plaintiff stated that she refused to sign the Employee Report because she did nothing wrong and

---

courts must disregard evidence the jury is not required to believe, including testimony of
interested witnesses."  Here, Raymond and Boschetti are employees of defendant and, therefore,
are more than just "interested witnesses."  However, the Court of Appeals in Lauren, addressing
the issue of preclusion of statements by a party when deciding a motion for summary judgment,
stated, "We cannot believe that the law precludes a party from presenting his own testimony on a
summary judgment motion which, of course, is not to say that when there is conflicting
testimony the court may accept the testimony of one witness, even if a party, rather than another."
Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 271 (3d Cir. 2007).

that she only slept while on her break.

Pursuant to the CBA, plaintiff and the union filed a grievance challenging the discipline. The CBA requires a Step-I hearing to be held when a disciplinary action is challenged. Plaintiff's Step-I hearing was held on September 25, 2006.  Before the Step-I hearing commenced and prior to plaintiff viewing the video, Raymond asked plaintiff what was on the video.  Plaintiff says she told him, "sometimes I read" and Raymond says she told him that she was praying.  Plaintiff, Raymond and Butch Lane, plaintiff's business agent from the union, then viewed video of the incident on a computer outside of the hearing room.  It is disputed whether plaintiff was permitted to view the entire video.  After viewing the video, plaintiff, Raymond and Lane went to the hearing room and the Step-I hearing officially began.  Raymond, Boschetti, plaintiff, her shop steward from the union and Lane were all present at the hearing.  Once the hearing commenced Boschetti read the Employee Report.  Raymond acted as the hearing officer. Raymond then asked if plaintiff had anything to say about the video and she responded that she was on her lunch break.  At no time during the hearing did she mention that she was on medication.

The day after the hearing, Raymond received a printout of the activity from plaintiff's computer from the night of the incident.  This report confirmed that plaintiff "partialed out" at 4:04 a.m. and signed back in at 4:38 a.m.  This information was not reviewed at the hearing but it is uncontradicted that Raymond received it and reviewed it before issuing his determination.  On September 28, 2006, Raymond denied the Step-I grievance challenge and stated:

> The facts are that on Tuesday, September 12, 2006, Mrs. Cange was
>
> observed on security cameras at various times between 4:00 a.m. and

6

5:00 a.m. sleeping in a Cashier's booth while on duty.

During the hearing Mrs. Cange testified that she was not sleeping but was praying while on duty.  After viewing the videotape with the Union and Mrs. Cange, she then retracted her statement.  At that point Mrs. Cange had an opportunity to give the Authority some type of reasonable explanation for her actions.

Unfortunately, Mrs. Cange failed to be truthful regarding her unacceptable behavior.

Clearly, Mrs. Cange has violated the Authority's rules and regulations as it [sic] relates to sleeping while on duty.

The letter concluded by terminating plaintiff effective September 29, 2006.

Plaintiff received Raymond's letter and disagreed with its conclusions that she (1) slept at "various times between 4:00 a.m. and 5:00 a.m. . . . while on duty;" and (2) stated she was praying.  Because of these concerns, she contacted Lane, her business agent at the union, who in turn requested a Step-III hearing, by-passing Step II.

A Step-III hearing was held by Linda Miller, defendant's Senior Director, Facilities and Public Affairs, on October 25, 2006 and was attended by plaintiff, plaintiff's shop steward, Lane, Raymond, Boschetti and Miller.  Plaintiff states that at this hearing she explained to Miller that she was sleeping during her break and that she presented a note from her doctor explaining that she was taking medication at the time which could cause drowsiness.  Raymond states that at this hearing plaintiff presented the doctors note for the first time, but that she did not tell Miller she was on a break while she was sleeping.  On November 6, 2006, Miller issued her decision

7

upholding the termination on the grounds that plaintiff was sleeping while on duty.

After receiving the letter from Miller, plaintiff contacted Lane again and stated that the decision was a result of discrimination.[4]  Having exhausted the CBA grievance process, plaintiff filed a complaint with the Pennsylvania Human Relations Commission and the Equal Employment Opportunity Commission.  The PHRC dismissed her complaint on October 3, 2007, and the PHRC's findings were adopted by the EEOC on May 1, 2008.


DISCUSSION

Plaintiff filed a claim for national origin discrimination under Title VII and the Pennsylvania Human Relations Act, 43 Pa. Stat. § 951 et seq.  A plaintiff may demonstrate national origin discrimination with either direct evidence, Anderson v. Consol. Rail Corp., 297 F.3d 242, 248 (3d Cir. 2002), applying the standard set forth in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), or with indirect evidence under the burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  PHRA claims are analyzed under the same framework.  See Dici v. Commonwealth of Pennsylvania, 91 F.3d 542 (3d Cir. 1996).

**I.      Plaintiff Has Failed to Show Direct Evidence of Discrimination**

Plaintiff moves for summary judgment on the grounds that she has demonstrated direct evidence of national origin discrimination.  Under the standard announced by Justice O'Connor's opinion in Price Waterhouse, direct evidence of discrimination must demonstrate the

---

[4]      Plaintiff's Memorandum of Law in Support of her Motion for Summary Judgment states that she "*reiterated* that the decision was a result of discrimination," emphasis added.   The deposition testimony plaintiff cites does not support the proposition that she stated on more than one occasion that the decision was a result of discrimination.

> decisionmakers placed substantial negative reliance on an illegitimate
>
> criterion in reaching their decision . . . . [T]he plaintiff must produce
>
> evidence sufficient to show that an illegitimate criterion was a
>
> substantial factor in the particular employment decision such that a
>
> reasonable factfinder could draw an inference that the decision was
>
> made "because of" the plaintiff's protected status.  Only then would
>
> the burden of proof shift to the defendant to prove that the decision
>
> would have been justified by other, wholly legitimate considerations.

490 U.S. at 277.  Plaintiff does not come close to jumping the "high hurdle" set by this standard.

Anderson, 297 F.3d at 248.

Plaintiff argues that defendant's requirement that all employees provide "proof of citizenship" or certain INS documents when it took over airport parking operations in November 2004 is direct evidence of national origin discrimination in her case.  There are numerous reasons why her argument fails.  First, defendant is required by the Immigration Reform and Control Act of 1986 to confirm its employees' identities and their eligibility to work.  Additionally, in requesting the documents needed to comply with this law, defendant did not limit which forms of proof citizens could present by specifying only documents that would reveal employees' national origin.  Thus, while plaintiff chose to present her passport, which happened to reveal her country of birth as Haiti, she could have presented other forms of proof which would have not have revealed her national origin.  On its face, the request for documents is a neutral criterion of employment.  Even if the request were designed to reveal an employee's national origin, plaintiff does not show that any of the decisionmakers involved in plaintiff's termination were responsible

9

for establishing this policy.[5]

Furthermore, it is disputed whether the decisionmakers involved in plaintiff's discharge--Raymond, Boschetti and Miller--relied on information gathered through the November 2004 process when making their decision to discharge her in September/October of 2006.  As proof that Raymond knew her national origin, plaintiff points to Raymond's deposition testimony in which he states that he "processed" plaintiff when she was hired.  However, Raymond never testified that as part of this "processing" he saw her passport and learned she was born in Haiti.  She also notes that Raymond had access to her personnel file which contained the Personnel Data Summary form on which she indicated "HAITI" where it requested "Name and Location of Educational Institution."  However, it is not clear why this would necessarily require Raymond to conclude that plaintiff's national origin is Haitian.  While she has alleged "everyone" knew she was Haitian because she speaks with a heavy accent and she contributed recipes to a company cookbook that were from Haiti, both Raymond and Boschetti denied that they knew her national origin at the time of her termination.  Plaintiff has presented no evidence that Miller knew of plaintiff's national origin.

Plaintiff has failed to demonstrate that defendant's requirement that employees present certain documents was an "illegitimate criterion" designed to uncover her national origin so that this information could later be used by the decisionmakers involved in her discharge to discriminate against foreign-born Haitians.  Furthermore, there exists a material issue of fact as

---

[5]     Nor does plaintiff argue that the information was used at the time by the decisionmakers who implemented the policy for a discriminatory purpose.  The undisputed testimony of Raymond is that at the time of the change in operations, all union employees were being transferred to defendant; completion of any paperwork was for "file purposes" and "was not a part of the process for consideration before employment."

to whether Raymond, Boschetti and Miller knew plaintiff's national origin and relied on that information when they made the decision to terminate her. Therefore, plaintiff's motion for summary judgment on the grounds that there is direct evidence of national origin discrimination is denied.

## II.    Indirect Evidence of Discrimination

Plaintiff has also moved for summary judgment on the grounds that there is indirect evidence of national origin discrimination, and defendant has moved for summary judgment on the grounds that plaintiff cannot meet her burden of proof that defendant discriminated against her on the basis of her national origin. Under McDonnell Douglas, plaintiff must first satisfy the burden of proving by a preponderance of the evidence a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802. To establish a prima facie case of discrimination, plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action despite being qualified; and (4) that the adverse employment action occurred under circumstances that give rise to an inference of unlawful discrimination. Waldron v. SL Indus., Inc., 56 F.3d 491, 494 (3d Cir. 2005); see Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

Plaintiff may demonstrate the fourth element of her prima facie discrimination case by showing that the employer treated a similarly-situated employee who is not within the protected class differently than plaintiff. See Jones, 198 F.3d at 410-11. To show such unequal treatment, plaintiff must "set forth evidence to establish that [s]he was treated differently from . . . [her] coworkers for similar disciplinary infractions." Nicholson v. Bradley Graphic Solutions, Inc., 2004 WL 870692, at *4 (E.D. Pa. Apr. 22, 2004); quoting Davis v. City of Phila. Water Dep't,

11

2001 WL 1390750, at *3 (E.D. Pa. Nov. 7, 2001). "To be deemed 'similarly situated,' the individuals with whom a plaintiff seeks to be compared must 'have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Kimble v. Morgan Properties, 2004 WL 2536838, at *3 (E.D. Pa. Nov. 8, 2004), quoting Anderson v. Haverford College, 868 F. Supp. 741, 745 (E.D. Pa.1994), internal citations omitted.

Plaintiff may also satisfy the fourth element by showing other circumstances that give rise to an inference of unlawful discrimination. See Sarullo v. U.S. Postal Serv., 352 F. 3d 789, 798 (3d Cir. 2003), finding that the plaintiff need not necessarily establish that similarly-situated employees were rehired but "he must establish some causal nexus between his membership in a protected class and the decision to not rehire him."

If plaintiff succeeds in proving the prima facie case, the burden shifts to defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." McDonnell Douglas, 411 U.S. at 802. If defendant comes forward with such reasons, then the burden shifts back to plaintiff to prove that the legitimate reason proffered by defendant was pretextual. McDonnell Douglas, 411 U.S. at 804. At all times, the ultimate burden of persuading the trier of fact that defendant intentionally discriminated against plaintiff remains with plaintiff. Sarullo, 352 F.3d at 799 n. 10; Burdine, 450 U.S. at 253.

In order for plaintiff to prevail on her motion, she must show that she has met her burden of proof and that there is no material issue of fact preventing the grant of summary judgment on her claims. In order for defendant to prevail on its motion, it must show that plaintiff has failed to prove her case and there is no material issue of fact which would prevent this court from

dismissing her claims.

**A.      Plaintiff's Prima Facie Case**

Plaintiff satisfies the first three elements of a prima facie case of discrimination regarding

her discharge.  First, plaintiff is a member of a protected class given that her national origin is

Haitian.  Second, defendant does not dispute that plaintiff was qualified for the position; there is

sufficient evidence to show that she performed her job satisfactorily.  Third, she suffered an

adverse employment action when she was terminated.  The parties disagree as to whether

plaintiff raises an inference of discrimination which is the fourth element of her prima facie case.

Plaintiff argues that she satisfies this last element by showing that she was disciplined

more severely than Kim Earland and James Aria, two similarly-situated persons who are not

within plaintiff's protected class.  Kim Earland, an African-American, was also a cashier for

defendant.  The same Video Examiner who reviewed the surveillance video of plaintiff's

activities observed Earland sleeping in her booth on the same night and on the same shift as

plaintiff.  The Video Incident Report, also dated September 19, 2006, states, "Cashier sleeping

while on duty off and on throughout shift," and marks the time as "4 45 - 3 30 etc."  An

Employee Report was issued on September 20, 2006, and signed by Ragozzino, Raymond,

Giddare and Ciglar.  The report states,

> FACTS: On Tuesday, September 12, 2006 you were observed on
>
> security cameras sleeping in the cashier booth in lane 72.  You are
>
> charged with conduct unbecoming a PPA employee; failure to
>
> complete job duties, and sleeping or loafing while on duty.
>
> ACTION TAKEN: You are hereby suspended with the intent to

dismiss effective immediately . . . .

SUPERVISOR'S COMMENTS (OPTIONAL): refused to sign.

A Step-I hearing was held on September 25, 2006.  Raymond, Boschetti, Earland, her shop steward from the union and her business agent from the union – the same shop steward and agent present for plaintiff's hearing - were all present at Earland's hearing.  It is unclear whether Raymond viewed the video before, during or after the hearing.  When Raymond viewed the video he concluded Earland was not sleeping but loafing because he saw her "fidgeting" and "moving around" which he took as "not a sign of someone who was sleeping."  On September 28, 2006, Raymond stated in a letter to Lane containing his conclusions:

> The facts are that on Tuesday, September 12, 2006, Ms. Earland was observed on security cameras at various times sleeping or loafing in a Cashier's booth while on duty.
>
> During the hearing Ms. Earland admitted that she was in fact loafing. Ms. Earland stated that she placed her head down because she was having problems with her vision due to the lighting in the booth and the oncoming cars in her lane.  She acknowledged her mistake and promised that this type of situation would not happen again.
>
> It is the decision of the Authority not to terminate Ms. Earland but to have her serve a ten (10) day suspension . . . .
>
> Any further incidents of this nature will result in further disciplinary action up to and including discharge.

James Aria, self-described in PPA documents alternatively as Asian, Indian and East

14

Indian, was also a cashier.  An Employee Report was issued on September 21, 2006, and was

also signed by Ragozzino, Raymond, and Giddare.  The report states,

> FACTS: On Wednesday, September 20, 2006, you were observed on
>
> security cameras sleeping in the cashiers booth in lane 72 at the main
>
> toll plaza.  You are charged with conduct unbecoming a PPA
>
> employee; failure to complete job duties and sleeping or loafing while
>
> on duty.
>
> ACTION TAKEN: You are hereby suspended with the intent to
>
> dismiss effective immediately . . . .
>
> SUPERVISOR'S COMMENTS (OPTIONAL): refused to sign.

A Step-I hearing was held on September 25, 2006.  Raymond, Boschetti, Aria, his shop

steward from the union and his business agent from the union--again, the same shop steward and

agent as were present for plaintiff's hearing--were all present at Aria's hearing.  On September

28, 2006, Raymond stated in a letter to Lane containing his conclusions:

> The facts are that on Wednesday, September 20, 2006, Mr. Aria
>
> was observed on security cameras sleeping or loafing in a Cashier's
>
> booth while on duty.
>
> During the hearing Mr. Aria stated that he was not sleeping or
>
> loafing while on duty but was on his lunch break.
>
> After reviewing the videotape and checking with his supervisor, it
>
> was determined that Mr. Aria was in fact on his lunch break.
>
> In light of the above information, it is the decision of the Authority

to rescind Mr. Aria's termination.

Plaintiff argues that she is similarly-situated to Earland and Aria, but unlike them she was terminated and otherwise treated differently giving rise to an inference of discrimination. Defendant contends that plaintiff has produced no evidence to support her claim that "foreign-born Haitians" were treated less favorably than others because Aria and Earland are not similarly-situated employees.  I disagree and find that the two comparators presented by plaintiff did "engage[] in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  Kimble, 2004 WL 2536838, at *3 (E.D. Pa. Nov. 8, 2004), quoting Anderson, 868 F. Supp. at 745, internal citations omitted.

Defendant argues that Earland's case is distinguishable because (1) Raymond observed Earland loafing rather than sleeping; (2) Earland admitted to loafing at the Step-I hearing and plaintiff never admitted to the violation of which she was accused, even after being presented with the video evidence; and (3) Earland informed Raymond at or prior to the Step-I hearing of the fact she was having difficulty with her vision due to the oncoming traffic, and plaintiff did not mention to anyone that she was taking Allegra-D which could cause drowsiness until her Step-III hearing.

Assuming Earland was in fact loafing, this difference does not preclude Earland as a valid comparator.  First, defendant's Standard Operating Procedures' Code of Conduct states that sleeping or loafing while on duty "may be considered grounds for disciplinary action up to and including termination."  Thus, even if plaintiff were sleeping and Earland was loafing, their conduct is similar because both are punishable by termination.

16

Second, assuming Earland admitted to Raymond at the Step-I hearing that she was loafing while on duty.  Plaintiff on the other hand testified that she told Boschetti when he gave her the Employee Report that she only slept on her break.  She testified that she told Raymond prior to the hearing and viewing of the video that sometimes she reads[6] and after viewing the video that she was only sleeping while on her break.  It is a disputed question of fact whether plaintiff and Earland were actually sleeping/loafing, and therefore whether their admissions are truthful.  However, I find that the cases are not so dissimilar as to warrant rejecting Earland as a comparator just because they admitted to different things.

Third, Earland and plaintiff presented different mitigating factors at their hearings.  Raymond states in Earland's determination letter that the reason she was putting her head down on her desk was because she was having difficulty with her vision due to the oncoming traffic.  It is undisputed that during the hearing process plaintiff informed defendant that she was taking medication which could cause drowsiness.  It is immaterial to the question of whether Earland is a valid comparator that plaintiff did not raise her mitigating circumstance until her Step-III hearing whereas Earland raised hers during the Step-I hearing.  Plaintiff has raised an inference of discrimination by showing that Raymond's determination letter concerning Earland reflects his consideration of the mitigating factor, whereas Miller's determination letter concerning plaintiff does not reflect that she considered the mitigating factor.

---

[6]    It should also be noted that plaintiff was subjected to pre-hearing questioning about the video and that her statements to Raymond outside of the hearing were then cited in his determination letter as a basis for finding that her excuse, i.e. that she only slept on her break, was untruthful.  There is no evidence that Earland was or was not subjected to this pre-hearing questioning.  If there was disparate treatment in Raymond's pre-hearing procedures, this would be further indirect evidence of discriminatory treatment.

Defendant also argues that Aria's case is distinguishable because of a significant mitigating factor, i.e. he was not on duty while he was sleeping.  Plaintiff argues that rather than distinguishing her case from Aria's, this mitigating factor likens her case to Aria's because she too was sleeping while on a break.  Defendant argues that plaintiff now admits that she was sleeping while on duty from 4:01 a.m. to 4:04 a.m.  However, at no time during the hearing process did plaintiff admit she slept while on duty.  Furthermore, she continues to argue that her behavior was excused because she only slept while on her break.  Defendant argues that plaintiff admitted that she slept while on duty  in her dispositive motions.  In her motion for summary judgment plaintiff stated,

> However, Ms. Cange was not sleeping at "***various times*** between
>
> ***4:00 a.m. and 5:00 a.m. . . . while on duty***.  At the very most,
>
> during her 14-hour double shift, while on duty, she rested her head
>
> and dozed off for 195 seconds, from 4:01 a.m. to 4:04 a.m.,
>
> immediately prior to officially clocking out for her break.
>
> (emphasis in original).

Similarly, in plaintiff's opposition to defendant's motion she states,"In reality, Ms. Cange was observed sleeping or loafing on duty once, for mere [sic] 3 minutes, from 4:01 a.m. to 4:04 a.m." I recognize that these statements, if taken out of context could be construed to be an admission.  I find instead, viewing the statements in the light most favorable to plaintiff, that the statements are merely inartfully worded attempts to argue the facts in the alternative.  Since I find that plaintiff has not admitted that she slept while on duty, and defendant has raised no other argument that distinguishes Aria's case, I will consider Aria as a comparator.  Plaintiff has raised

an inference of discrimination because Aria, who is not a Haitian, was not terminated after he maintained that he was sleeping while on a break, but plaintiff was terminated when she was accused of the same conduct and offered the same excuse. Because plaintiff has presented to similarly-situated persons who are not members of the protected class and who were treated more favorably than plaintiff, I find that plaintiff has met her burden of proving her prima facie case.

   In addition to the comparator evidence, plaintiff points to additional indirect evidence of discrimination to support the fourth prong of her prima facie case. This evidence "must establish some causal nexus between [her] membership in a protected class and the decision to [terminate her]." Sarullo, 352 F. 3d at 798. Defendant did not call upon plaintiff as a shop steward in employee disciplinary matters. She states that while employed by her former employer, Central Parking Corporation, she was elected a shop steward by her union and was called upon when fellow employees were written up or disciplined. She states that after defendant took over airport parking operations she was no longer called upon to serve as a shop steward in these disciplinary matters. Plaintiff states that she complained to Boschetti about this and told him she felt discriminated against, but Boschetti did not respond to her. Boschetti states in his affidavit that defendant was never advised by the union that plaintiff was a shop steward. This dispute as to whether defendant knew or did not know that plaintiff was a shop steward is immaterial because it is undisputed that the union elected its shop stewards and selected who would participate in disciplinary matters; plaintiff has not argued or presented any evidence that defendant had any control over these decisions. Thus, if it was the union's decision as to who was to serve as its shop steward at employee disciplinary matters, plaintiff's failure to be appointed to serve cannot be attributed to defendant's discrimination. This evidence fails to raise an inference of

19

discrimination.

**B.    Defendant's Proffered Legitimate Non-Discriminatory Reason for Its Action**

The burden now shifts to defendant to "articulate some legitimate, nondiscriminatory reason" for the employment decision.  McDonnell Douglas, 411 U.S. at 802.  This "relatively light" burden requires defendant to introduce evidence which if taken as true would permit the conclusion that there was a nondiscriminatory reason for the challenged action.  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

Defendant contends that plaintiff was terminated because she violated defendant's Standard Operating Procedures and Employee Manual by sleeping while on duty.  Defendant's Standard Operating Procedures' Code of Conduct states that sleeping or loafing while on duty "may be considered grounds for disciplinary action up to and including termination." Defendant's Employee Manual also states, "Some violations are so serious they require immediate suspension with intent to terminate the employee.  The following serious violations may lead to immediate termination: . . . 10.  Sleeping on duty."  It is undisputed that plaintiff had notice of defendant's rules and regulations and that these rules and regulations were reasonably related to business necessity.  While plaintiff maintains she did not sleep while on duty, the "key question in a discrimination case like this one is not whether [the plaintiff] was truly [sleeping], but whether the employer really believed that [s]he was [sleeping], such that the termination was based on a non-discriminatory reason."  Hitt v. Harsco Corp., 356 F.3d 920, 924 (8th Cir. 2004); see also Brathwaite v. Vance Federal Sec. Services, Inc., 613 F. Supp. 2d 38, 48 (D.D.C. 2009). Plaintiff does not argue that defendant did not believe that she was sleeping while on duty.  In addition to her violation of the rule, defendant also cites as legitimate reasons for her termination

20

the fact that plaintiff could not provide a good reason for her behavior at the Step I hearing and that she refused to admit to sleeping while on duty.

Defendant's evidence that it terminated plaintiff for her violation of company policy is sufficient to satisfy its "relatively light" burden of demonstrating that it had a legitimate, nondiscriminatory reason for terminating plaintiff's employment.  Defendant found that plaintiff was sleeping while on duty, an offense which was punishable immediately by termination. Furthermore, when confronted with the charge, she did not admit to the act but stated first that she was reading, then that she was on her break, and finally that she was on medication.   It is reasonable to conclude that defendant terminated her for violating the company rules as well as for subsequently covering up and denying the act, both of which are legitimate, non-discriminatory reasons for her termination.

### C.    Pretext

Because defendant has established a legitimate, non-discriminatory reason, plaintiff must have the opportunity to demonstrate by a preponderance of the evidence that the reasons offered by defendant are not the true reasons for her termination but are merely a pretext for discrimination.  McDonnell Douglas, 411 U.S. at 804.  To show that an employer's reasons are pretextual, plaintiff must point to "some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Fuentes, 32 F. 3d at 764; see also Atkinson v. La Fayette College, 460 F.3d 447, 454 (3d Cir. 2006).

To discredit the employer's proffered reason under the first Fuentes prong, "plaintiff

cannot simply show that the employer's decision was wrong or mistaken, since the factual

dispute is whether discriminatory animus motivated the employer, not whether the employer is

wise, shrewd, prudent or competent." Fuentes, 32 F. 3d at 765.  Rather, the nonmoving party

"must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies or

contradictions in the employer's proffered legitimate reason for its action that a reasonable fact

finder *could* rationally find them unworthy of credence, and hence infer that the employer did not

act for the asserted nondiscriminatory reasons." Id., internal citations omitted, emphasis in

original.

      Under the second Fuentes prong, plaintiff could establish that defendant's proffered

reason was pretextual by showing that an "invidious discriminatory reason was in fact, more

likely than not a motivating or determining cause of his termination." Id. at 764.  To do so,

plaintiff may show that the employer has previously discriminated against her, that the employer

has previously discriminated against other similarly-situated members of the protected class or

another protected class or that defendant has treated more favorably similarly-situated people not

within the protected class. See, e.g., Simpson v. Kay Jewelers, 142 F.3d 639, 645 (3d Cir. 1998).

When using comparators to show pretext, the comparators "must have dealt with the same

supervisor, have been subject to the same standards and have engaged in the same conduct

without such differentiating or mitigating circumstances that would distinguish their conduct or

the employer's treatment of them for it." Morris v. G.E. Financial Assurance Holdings, 2001 WL

1558039, at * 6 (E.D. Pa. Dec. 3, 2001), quotations omitted.  Plaintiff might also "show pretext

with overt evidence of discriminatory animus or indirect evidence of an ulterior actionable

motive for the adverse employment action." Ahmed v. Lowe's Co. Inc., 2008 WL 2967061, at

*6 (E.D. Pa. July 31, 2008).

First, plaintiff argues that defendant's proffered reason for her termination is pretextual because defendant treated similarly-situated people not within the protected class more favorably. As discussed above, Earland and Aria are relevant comparators.  It is not the truth of defendant's assertion that plaintiff was sleeping which is at issue, "but rather the integrity of [defendant's] decision-making process in terminating [p]laintiff."  Ahmed v. Lowe's Co. Inc., 2008 WL 2967061, at * 5 (E.D. Pa. Jul. 31, 2008), citing Andy v. United States Postal Services, Inc., 2003 WL 22697194, at *9 (E.D. Pa. Oct.24, 2003) aff'd 111 Fed. Appx. 670 (3d Cir. Nov.1, 2004). Plaintiff argues that her statements made to Raymond prior to the actual commencement of the Step-I hearing were later cited by him as reasons to terminate her.  Raymond testified that it was common procedure to question an employee prior to a hearing to give him or her an opportunity to explain their behavior.  However, there is no evidence that either Earland or Aria were subjected to pre-hearing questioning.  If plaintiff was questioned prior to her hearing and her statements later formed the basis for her termination, but Earland and Aria were never subjected to similar questioning (and thus those statements could not later be used against them), this raises an issue as to the legitimacy of defendant's decision-making process. Plaintiff has raised an issue as to whether defendant's proffered legitimate reason is pretextual thereby preventing summary judgment in favor of defendant.

Plaintiff has not shown that defendant's proffered legitimate reasons were as a matter of law pretextual and, thus, I will not grant plaintiff summary judgment.  Plaintiff presents two lines of argument.  The first compares the actions taken in her case to those in Earland and Aria's cases: that defendants did not investigate her claims as thoroughly as Aria's; that her mitigating

23

factors were not considered to the same extent that Earland's mitigating factors were considered; and that defendant failed to follow its progressive discipline policy.  The second line of argument compares three other Haitians who were terminated--Elias Cange, Patrick Jacques and Marie Pierre--to Earland and Aria.  I find that none of plaintiff's arguments demonstrate as a matter of law that defendants' stated reason for terminating plaintiff was pretextual.

Plaintiff argues that in Aria's case, after the Step-I hearing Raymond was able to confirm with his supervisor that he was on his break during the time Aria was observed sleeping. Raymond could not confirm with plaintiff's supervisor that she was entitled to a lunch break starting at 4:00 a.m. because no supervisor was on duty that night.  Raymond testified that instead, after the hearing, he reviewed print outs of plaintiff's log from that night and confirmed she "partialed out" at 4:04 a.m.  Plaintiff does not dispute that she "partialed out" at 4:04.  This evidence does not demonstrate as a matter of law that defendant's proffered reason is pretextual.

Plaintiff also argues that Earland was treated more favorably than she was.  Plaintiff does not dispute that Earland presented an excuse (that she was putting her head down because she was having problems with her vision due to the oncoming lights in her lane) at her Step-I hearing whereas plaintiff did not present her excuse (that she was on medication which caused drowsiness) until her Step-III hearing which was held over a month after plaintiff first received the Employee Report.  Furthermore, plaintiff states that she presented the evidence to demonstrate that she was sleeping or resting her head during her break and not praying.  Miller's decision concluded that plaintiff was sleeping and upheld her termination.  Consideration of the fact that plaintiff was on medication only substantiated the earlier finding that plaintiff was in fact sleeping.  Thus, this evidence does not show that defendant's proffered reason was, as a

24

matter of law, pretext.

Plaintiff argues that pretext is shown by defendant's failure to follow its own progressive discipline policy.  However, while the Employee Manual describes disciplinary progressive actions, it clearly states, "The disciplinary progression just described is illustrative only.  Steps in the progression may be omitted if the violations are serious in that they jeopardize the safety of employees or the public, undermine the credibility or reputation of the Authority or create a disruption of the workplace.  Some violations are so serious they require immediate suspension with intent to terminate the employee.  The following serious violations may lead to immediate termination: . . . 10.  Sleeping on duty."  Thus, defendant's failure to apply disciplinary progression does not demonstrate as a matter of law that its stated reason for terminating plaintiff was pretextual.

In addition to the Earland and Aria comparator evidence, plaintiff argues that defendant's proffered reason is pretextual because defendant previously discriminated against three other foreign-born Haitian cashiers: Elias Cange, plaintiff's husband, Patrick Jacques, and Marie Cange, plaintiff's sister.  Elias Cange was terminated after receiving two verbal warnings (which are not considered to be disciplinary actions) and a ten-day suspension after video surveillance showed he had placed $250 between his computer and keyboard in the cashier's booth (an offense for which he could have been immediately terminated).  Along with his suspension, he received a warning that any other infractions could lead to termination.  About two months after the suspension, Elias Cange was found to have a shortage of cash in his drawer and he was terminated.  Patrick Jacques received a verbal warning, and then within a three-week period a written warning, one-day suspension and a three-day suspension for an overage and shortages of

25

cash in his drawer.  He was then terminated when "currency from customer transactions were discovered in [his] personal belongings."  Finally, Marie Pierre stated in her deposition that she quit her job as a cashier after plaintiff was discharged because she was afraid she was going to be discharged like plaintiff and other Haitians had been.

While evidence of whether defendant has discriminated against other Haitians could show that defendant's proffered reason for terminating plaintiff is pretextual, plaintiff has failed to show that discrimination was, as a matter of law, a factor in Elias Cange, Patrick Jacques or Marie Pierre's cases.  First, plaintiff has not shown that defendant even knew that these three employees were Haitian.  Second, plaintiff does not deny that Elias Cange and Patrick Jacques committed the infractions for which they were ultimately terminated and that defendant's rules permit immediate termination for the commission of these infractions.  Third, neither Elias Cange nor Patrick Jacques ever suggested or alleged discrimination based on their national origin.  Finally, Marie Pierre, who testified that a co-worker told her that "they" were watching her because she was Haitian, also never alleged she was discriminated against or had an adverse action taken against her because of her national origin; in fact, she resigned and in her resignation letter stated that she "enjoyed working" for defendant and "appreciated the support you gave me."

CONCLUSION

I will deny plaintiff's motion for summary judgment.  Plaintiff has not shown as a matter of law that defendant's reason was "false and that discrimination [based on her national origin] was the real and determinative reason" for her termination.  Hasson v. Glenside School Dist.,

2008 WL 4531959, at *2 (3d Cir. Oct. 10, 2008).  However, plaintiff has raised a material issue

with respect to the legitimacy of defendant's decision-making process, and thus as to whether

defendant's proffered reason is pretextual.  I will therefore also deny defendant's motion for

summary judgment.