IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARIE CANGE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. 2:08-CV-3480 |
| v. | : | |
| | : | |
| PHILADELPHIA PARKING AUTHORITY, | : | |
| | : | |
| Defendant. | : | |

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
MOTION FOR JUDGMENT.**

---

The jury began deliberations after a four day trial on February 19, 2010. After several hours of deliberations, the jury communicated to the Court that, while it has reached a unanimous verdict and found that plaintiff Marie Cange ("Cange") failed to prove that her Haitian national origin was a "determinative factor" in her termination by defendant, the Philadelphia Parking Authority ("PPA"), it is deadlocked on the only other liability question, i.e. whether Cange's national origin was a "motivating factor" for her termination.[1] This second question was given to the jury based on the Court's determination that a "mixed motive" instruction was appropriate on the evidence.

The Court has appropriately required the jury to continue its deliberations. It is anticipated that, in the event the jury does not reach a unanimous verdict on the "mixed motive" charge after another day of deliberations, Cange will move for a mistrial and ask for a new trial. This should not occur. In the first instance, the Court should grant PPA's motion for judgment as a matter of law with respect to even the lesser standard of causation required by Cange's "mixed motive" theory of discrimination. Alternatively, the Court should reconsider its decision

---

[1] To the extent the jury followed the Court's instructions and Verdict Form, the jury's consideration of Question No. 2 necessarily required the jury to find, unanimously, in favor of PPA on Question No. 1. Moreover, if the jury had unanimously found that Cange proved the heavier "determinative factor" standard, it could not be deadlocked with respect to the lighter "motivating factor" standard.

to give the jury a mixed motive charge, obviating the need for the jury to address the "motivating factor" question as to which the jury is deadlocked, and accept the jury's unanimous verdict on the pretext theory as a complete verdict.

## ARGUMENT.

A.  **The Court Has Discretion To Enter Judgment Or Accept The Jury's Unanimous Verdict As To Certain Questions.**

In the event the jury remains deadlocked on its answers to certain questions, the Court need not declare a mistrial and order a new trial. The Court also has the discretion, prior to dismissing the jury, to accept the jury's verdict as to those questions on which its verdict is unanimous. See Baxter Healthcare Corp. v. Spectramed, Inc., 49 F.3d 1575, 1581 (Fed.Cir.), cert. denied, 516 U.S. 906, 116 S.Ct. 272 (1995)(court's dismissal of deadlocked jury, even with statement that "there is a legal necessity to declare a mistrial with respect to this matter," did not nullify court's power to enter judgment based on jury's answers to questions on which unanimous verdict was reached); Withers v. Ringlein 745 F.Supp. 1272 (E.D.Mich. 1990)(trial court accepted partial verdict in civil case after jury reported deadlock on certain questions).

As set forth more fully in Part C, infra, it also is within the Court's discretion to modify its instructions -- and specifically to withdraw its mixed motive charge and modify the verdict form accordingly -- notwithstanding the fact that the jury has begun its deliberations. Stackhouse v. Pennsylvania State Police, 219 Fed.Appx. 173, 175 (3d Cir. Jan 30, 2007).

Likewise, the Court clearly has the authority to enter judgment pursuant to Rule 50, F.R.C.P. See Noonan v. Midland Capital Corp., 453 F.2d 459, 463 (2d Cir.), cert. denied, 406 U.S. 945, 92 S.Ct. 2044 (1972)("That the case was originally sent to the jury which twice reported itself deadlocked, after considerable deliberation, does not mean that the actual disagreement was fair and reasonable. If the position of some jurors favoring plaintiff is enough, there could never be a judgment for insufficiency of the evidence notwithstanding a verdict, nor

2

the direction of judgment on that ground after a mistrial. Both are commonplace and envisaged by Rule 50(b), F.R.C.P."); Kerman v. City of New York, 261 F.3d 229 (2d Cir. 2001)(district court properly accepted partial verdict on unanimous questions; district court subsequently entered judgment under Rule 50, F.R.C.P., with respect to deadlocked issues which was reversed by Second Circuit only on merits).

### B. There Is No Evidence Upon Which A Reasonable Jury Could Find That Cange's National Origin Was A Motivating Factor In Her Termination.

Even viewing the evidence presented at trial in a light most favorable to Cange, no reasonable jury could conclude that her termination was motivated in any part by her national origin. First, it bears emphasis that Cange cannot possibly prove that the initial decision to terminate her, made by Frank Ragozzino and Joseph Boschetti on September 20, 2006, was the product of national origin discrimination. The testimony at trial was undisputed that Ragozzino and Boschetti terminated <u>every</u> employee who was reported to have been sleeping on duty -- whether by video surveillance or a manager's observation -- in <u>exactly</u> the same manner. This includes Kim Earland and James Aria, the two comparators who are at the heart of Cange's case.[2]

This leaves Cange's case resting solely on the premise that Bill Raymond, PPA's Director of Human Resources, discriminated against Cange on the basis of her national origin when he upheld her termination in the grievance process. Here too, the trial evidence does not permit any reasonable jury to conclude that Cange's national origin was a motivating factor in Raymond's decision.

First, there is no evidence that Raymond even <u>knew</u> Cange's national origin. Cange's testimony regarding the knowledge of "everyone" at the Airport does not impute such

---

[2] The only exception involved the case of Lisa Fisher, an African-American woman who was reported by a customer to have been sleeping on duty, and who received a 10 day suspension for loafing from Ragozzino and Boschetti. However, Ragozzino's testimony was undisputed that customer complaint cases are treated differently. Given PPA's inability to prove that Fisher was sleeping without involving the customer, Ragozzino and Boschetti imposed a 10 day suspension. There was no contrary testimony regarding the facts of Fisher's case.

3

knowledge to Raymond, who Cange agreed did not work at Philadelphia International Airport. Nor did Cange, even in her self-contradicting rebuttal testimony (she admitted she never served as a shop steward while a PPA employee, yet claimed discussions in connection with collective bargaining negotiations as a shop steward), so much as hint that she had explicit discussions with Raymond regarding her national origin. Nor was there any testimony or evidence that Raymond had any involvement in the employment authorization process or any occasion to review Cange's personnel records which listed her place of education as Haiti. The fact that Cange speaks with an accent does not permit a jury to infer that Raymond knew that Cange was Haitian, particularly since Butch Lane similarly testified that he did not know Cange's national origin.[3]

In sum, Raymond's testimony that he was unaware of Cange's national origin was not rebutted. In the absence of any evidence that he had such knowledge, no reasonable jury could find that he intentionally discriminated against Cange because she is Haitian, in whole or part. Moreover, Cange herself acknowledged that she was aware of no reason why Raymond would discriminate against her, other than the absurd notion that Haiti is a "poor country."

Even assuming a jury could conclude that Raymond knew Cange's national origin, there is no basis for a jury to conclude that Raymond discriminated against her on that basis in his Step I decision. The evidence was undisputed that Raymond upheld the terminations of multiple non-Haitians for sleeping on duty, including white and black employees, and including employees who were discharged months before Cange. Conversely, Raymond reduced or rescinded discipline for persons of various races and national origins, including blacks, Hispanics and a Trinidadian (Aria). For this reason alone, no reasonable jury could infer national origin as a factor motivating Raymond's decision-making.

Moreover, even accepting Cange's testimony, the evidence is undisputed that there were

---

[3] As this case focuses on Cange's Haitian national origin and not simply that she was deemed "foreign" by her accent, Cange must prove by competent evidence that the decision-maker who was the purported discriminator, Raymond, knew she was Haitian -- no such direct or circumstantial evidence exists or was presented to the jury.

4

significant factors distinguishing Cange's grievance from those of Earland and Aria. Both Aria and Earland were honest in responding to Raymond's question regarding what the video would show. Cange indisputably was not, regardless of whether she said she was praying or reading. Raymond's reliance on Cange's lack of honesty is a critical distinguishing factor, even if Cange's testimony were accepted. No jury could reasonably find that national origin was any factor in the decision-making on this basis, particularly given the clear law that the jury is not entitled to question the wisdom or business judgment of the employer. Nor was there a scintilla of evidence calling into doubt the facts and circumstances of Aria's and Earland's cases and grievance hearings.

Aria, unlike Cange, was proven to be on break when he was asleep. Cange was not on break, a fact she admitted in her testimony when she acknowledged that she had not "partialed out" before she fell asleep. This is buttressed by the undisputed shift report, which confirms that Cange did not partial out until 4:04 a.m. Critically, Cange admitted that she never told Raymond that she had some agreement with Earland to start her break at 4:00 a.m. and had just "forgotten" to partial out. Incredibly, Cange's own counsel acknowledged to the jury during rebuttal that trial was the first time Cange <u>ever</u> made this claim, admitting that Cange told a different story at her deposition, when she testified under oath that she partialed out <u>before</u> she chose to "rest her head." No reasonable jury could conclude that Raymond's failure to consider evidence of which he was not aware was motivated by national origin discrimination in any way. (For the same reason, Cange's "medication" excuse could not be considered by the jury with respect to Raymond's purported discrimination against Cange, as she admittedly did not present that information at the Step I hearing.) Moreover, there is absolutely no evidence in this record which would permit the jury to disregard both Raymond's and Ragozzino's testimony that, even had Cange offered this "excuse" at the time, they <u>still</u> would have terminated Cange consistent with PPA's application of its rules.

5

There was no evidence presented at trial contradicting Raymond's testimony -- as supported by his contemporaneous written decision -- that PPA could not <u>prove</u> that Kim Earland was asleep. The <u>undisputed</u> evidence was that Earland denied sleeping, but admitted to loafing. The <u>undisputed</u> evidence was that the video of Earland did not conclusively show her sleeping, as her hat was pulled over her eyes. Lane quickly corroborated this, with emphasis that PPA could not "prove" Earland was sleeping. The fact that video of Earland was not presented is irrelevant, as no spoliation charge was presented and the jury is not permitted to infer anything from the fact that the video was not played. Moreover, Raymond's testimony regarding the video of Cange at 3:22 a.m. -- in which he could not see her eyes -- was uncontested and consistent with his decision <u>not</u> to rely on that clip when he terminated Cange. Thus, the only evidence which the jury is permitted to consider conclusively establishes a determinative distinction between Earland's and Cange's grievance cases. Again, no jury could determine that national origin motivated Raymond's decision in <u>any</u> part. Cange's case ultimately rests on nothing more than the fact that she is Haitian, and the sheer speculation that Raymond would not have upheld her termination if she were not.

Given the lack of any evidence which would permit a jury to find in Cange's favor with respect to Raymond's decision, the evidence regarding the Step III decision becomes irrelevant as a matter of law. Even were that not the case, there is not a shred of evidence in the record that Linda Miller, the Step III decision-maker, either knew Cange's national origin or ever treated any similarly-situated non-Haitian employee more favorably.

At a minimum, the Court should enter judgment in favor of PPA as a matter of law as to the "motivating factor" question.

  **C. Alternatively, The Court Should Reconsider Its Mixed Motive Charge And Accept The Jury's Verdict As Complete.**

In the alternative, the Court should exercise its discretion and reconsider the propriety of

6

its "mixed motive" instruction. "The Third Circuit Court of Appeals has adhered to a <u>distinction</u> between 'pretext' cases, in which the employee asserts that the employer's justification for an adverse action is false, and 'mixed-motives' cases, in which the employee asserts that both legitimate and illegitimate motivations played a role in the action." <u>Stackhouse v. Pennsylvania State Police</u>, 2006 WL 680871, *4 (M.D.Pa., March 14, 2006)(emphasis added), <u>aff'd</u>, 219 Fed.Appx. 173 (3d Cir. Jan 30, 2007).[4] See <u>Makky v. Chertoff</u>, 541 F.3d 205, 215 (3d Cir. 2008); <u>Hanes v. Columbia Gas of Pennsylvania Nisource Co.</u>, 2008 WL 3853342 at *4, n.12 (M.D.Pa. August 15, 2008). In making this determination, "the Court will look to the substance of the plaintiffs' claims and the evidence presented at trial." <u>EEOC v. Aldi, Inc.</u>, 2009 WL 3183077, *12 (W.D.Pa., Sept. 30, 2009).

"Practically speaking, the <u>distinction</u> between a pretext case and a mixed-motive case often turns on the <u>strength or type of evidence</u> adduced by the plaintiff employee." <u>Id.</u> at *11 (emphasis added). Hence, as the comments to Third Circuit's Model Civil Jury Instructions, § 5.1.2 (3d Cir. 2009).cmt. at 10, instruct:

> "'While direct evidence is not required to make out a mixed motive case, it is nonetheless true that the distinction between 'mixed-motive' cases and 'pretext' cases is often determined by whether the plaintiff produces direct rather than circumstantial evidence of discrimination. If <u>the plaintiff produces direct evidence of discrimination, this may be sufficient to show that the defendant's activity was motivated at least in part by animus toward a protected class, and therefore a 'mixed motive' instruction is warranted</u>. If the evidence of discrimination is only circumstantial, then the defendant can argue that there was no animus at all, and that its employment decision can be explained completely by a non-discriminatory motive; it is then for the plaintiff to show that the alleged non-discriminatory motive is a pretext, and accordingly Instruction 5.1.2 should be given.'"
> <u>EEOC v. Aldi</u>, <u>supra</u>, 2009 WL 318307 at *11 (Emphasis added.)

Thus, "[a] mixed-motive theory of discrimination ... is usually put forth by presenting evidence of 'conduct or statements by persons involved in the decisionmaking process that may

---

[4] Copies of the decisions of the District Court and Court of Appeals in <u>Stackhouse</u> are attached to this Memorandum of Law as Exhibits "A" and "B," respectively.

be viewed as directly reflecting the alleged discriminatory attitude.'" Stackhouse v. Pennsylvania State Police, supra, 2006 WL 680871 at *4 (quoting Griffiths v. CIGNA Corp., 988 F.2d 457, 470 (3d Cir.1993), overruled on other grounds by Miller v. CIGNA Corp., 47 F.3d 586 (3d Cir.1995)). See Armbruster v. Unisys Corp., 32 F.3d 768, 778 (3d Cir.1994)(in mixed-motive cases "the evidence the plaintiff produces is so revealing of discriminatory animus that it is not necessary to rely on any presumption from the prima facie case to shift the burden of production."). As the Second Circuit has similarly explained, in order to "justify a mixed-motive instruction," a plaintiff must "produce a 'smoking gun' or at least a 'thick cloud of smoke,' to support his allegations of discriminatory treatment." Olson v. New York, 315 Fed.Appx. 361, 363 (2d Cir. 2009)(district court properly refused to give mixed motive instruction).

Here, over PPA's objection, the Court instructed the jury on both pretext and mixed motive theories. However, the Court never identified the strong evidence -- the evidence "so revealing of discriminatory animus" -- presented by Cange to justify the lesser, "motivating factor" charge. Nor has Cange herself ever explained how, on this record, a mixed motive theory is appropriate. Cange merely suggested that, as a matter of law, the Court may charge the jury on both theories. As noted above, there was certainly no substantial evidence of discrimination presented during this trial -- no statements reflecting any general animus towards Haitians at PPA, and no specific evidence that PPA considered national origin in connection with its decision to terminate Cange or its decisions with respect to other employees. There was no "smoking gun" nor any evidence creating a "thick cloud of smoke."

This Court previously has made clear, in deciding the parties' respective motions for summary judgment, that Cange has not even come close to presenting the quantum of evidence necessary to justify a mixed motive jury instruction:

> "Under the standard announced by Justice O'Connor's opinion in Price Waterhouse [v. Hopkins, 490 U.S. 228 (1989)], direct evidence of discrimination must demonstrate the

> "'decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision . . . . [T]he plaintiff must produce evidence sufficient to show that an illegitimate criterion was a substantial factor in the particular employment decision such that a reasonable factfinder could draw an inference that the decision was made "because of" the plaintiff's protected status. Only then would the burden of proof shift to the defendant to prove that the decision would have been justified by other, wholly legitimate considerations.' 490 U.S. at 277.
>
> "<u>[Cange] does not come close to jumping the 'high hurdle' set by this standard</u>." [Memorandum Opinion dated October 30, 2009 at 8-9 (emphasis added, citation omitted).]

Nothing changed at trial. Cange's <u>entire</u> case rested on the need for the jury to draw an <u>inference</u> of discrimination from PPA's alleged disparate treatment of other employees. Even in that regard, the evidence was circumstantial at best, and nowhere near the quantum of strong evidence necessary to justify a mixed motive charge. There was no substantial evidence to demonstrate that Cange's national origin was a factor in her termination. Much to the contrary, as described above, there was extensive evidence of significant distinctions between Cange and the non-Haitiain comparators, as well as extensive undisputed evidence that non-Haitian employees were terminated for the same offense. At most, Cange merely argued that those distinctions, while factually undisputed, should not be accepted by the jury as explaining the reasons for Raymond's decisions. Again, Cange asks for nothing short of speculation that Raymond would not have fired her if she were not Haitian.

In short, the evidence presented at trial was that of a garden variety pretext case. Cange's counsel acknowledged this during closing arguments, expressly noting the lack of any "smoking gun" and repeatedly asking the jury to infer that the stated reason for Cange's termination was a pretext, that PPA would not have fired Cange if she were not Haitian, notwithstanding the fact that numerous non-Haitian employees were terminated for violating the same rule. Cange never once presented this case as one where PPA was motivated by both lawful and unlawful factors, nor did PPA ever raise this as an affirmative defense. The confusion inherently created by the

Court's mixed motive charge as applied to the trial evidence is reflected in Question No. 3 -- the question of whether PPA proved that it would have terminated Cange <u>notwithstanding</u> its unlawful discriminatory motive. Neither party argued this at <u>any</u> point.

If a mixed motive charge were justified in this case, then <u>every</u> Title VII plaintiff would be entitled to a lesser, "motivating factor" charge. This clearly is not the law; the distinction between pretext and mixed motive charges is significant and must be given meaning by the Court. See <u>Stackhouse v. Pennsylvania State Police</u>, <u>supra</u>, 2006 WL 680871 at *5 ("While direct evidence is not a prerequisite for a mixed-motive instruction, see <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90, 99-101, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), <u>it does not follow that a mixed-motive instruction must be given in every case</u>.")(emphasis added, footnote omitted).[5]

The Fourth Circuit's decision in <u>Rowland v. American General Finance, Inc.</u>, 340 F.3d 187, 193 (4th Cir. 2003), a sex discrimination case in which the Court found that plaintiff had produced evidence sufficient to warrant a mixed motive charge, is instructive. Critically, the Court focused on the necessity of evidence which tied specific discriminatory animus against women to the employer's decision not to promote plaintiff:

> Applying the <u>Costa</u> standard to the facts of this case, it is clear that Rowland offered sufficient evidence to support a mixed-motive instruction. This includes evidence that (1) Roach had the authority to promote a person to district manager; (2) Roach knew of Rowland's undisputed qualifications for and interest in that position; (3) Roach assertedly stated to Rowland at their February 1996 meeting: <u>'I just don't need another woman in this position'</u>; and (4) <u>Shelby Bennett purportedly stated to Rowland in response to Rowland's expressions of concern about the lack of promotional opportunities for women at American General: 'that's just life at American General. That's the way it is. The men run the company,</u>

---

[5] In <u>Desert Palace, Inc. v. Costa</u>, <u>supra</u>, the Supreme Court held that Title VII imposes no heightened evidentiary burden on a plaintiff in a mixed-motive case and that direct evidence of discrimination is not required in order to prove discrimination in a mixed motive case. "However, <u>Desert Palace</u> did not do away with the distinction between pretext and mixed-motive cases entirely, only with the gatekeeping question of what sort of evidence was required for each to survive summary judgment." <u>EEOC v. Aldi</u>, <u>supra</u>, 2009 WL 3183077 at *11. "After <u>Desert Palace</u>, the distinction between pretext and mixed-motive cases ... lives on and the corresponding jury instructions are still applicable to each." <u>Id.</u> (citations omitted).

10

> and you just have to do what they say.' In sum, Rowland provided evidence that Roach-the supervisor who knew of her qualifications for and interest in the district manager position and who had the power to promote her but did not do so-told her that he did not need any more women in the position that she sought, as well as statements by another female superior suggesting that sex was a 'motivating factor' in employment decisions at American General. Under Costa, this evidence certainly suffices to merit a mixed-motive instruction." (Emphasis added.)

There is nothing even remotely approaching such evidence in this case. Where, as here, there is no such evidence, courts have not hesitated to refuse to give mixed motive charges. See Kovoor v. School District of Philadelphia, 93 Fed.Appx. 356, 359 (3d Cir. 2004)("The District Judge explained at the charge conference that a mixed motive charge was inapplicable because there was no direct evidence linking discrimination with the failure to promote.... We agree.")[6]; EEOC v. Aldi, Inc., supra, 2009 WL 3183077 at *12 ("Although Plaintiffs argue vehemently for the less demanding 'motivating factor' instruction, they have not pursued this case as a mixed-motive case, nor has Aldi raised a mixed-motive defense."); Stackhouse v. Pennsylvania State Police, supra, 2006 WL 680871 at *5 (court refused to give mixed motive instruction in "garden-variety" pretext case where plaintiff's case rested on circumstantial evidence that plaintiff was passed over for promotion in favor of less qualified male employees; "Neither at summary judgment nor at trial did Stackhouse offer any direct evidence that she was discriminated against because of her gender. In the final analysis, there was simply no basis upon which the court could justify a mixed-motive instruction.").

Thus, even if the Court is unwilling to enter judgment pursuant to Rule 50, F.R.C.P., the Court should reconsider its decision to charge the jury on a "mixed motives" theory in order to correct a manifest legal error. It is fully appropriate for the Court to do this while the jury is deliberating. In Stackhouse v. Pennsylvania State Police, supra, the Third Circuit explicitly approved of the trial court's decision to modify its charge, during deliberations, after it

---

[6] The Third Circuit's decision in Kovoor v. School District of Philadelphia, supra, was after the Supreme Court's decision in Desert Palace, Inc. v. Costa, supra.

11

recognized the impact of its improper inclusion of mixed motive elements in its <u>original</u> charge:

> "<u>After considerable deliberation</u>, the jury returned with a question as to whether the instruction in question was inconsistent. The Court, after discussion with counsel, decided that the instruction was in fact incorrect in that it contained elements of both a mixed motive claim and a pretext claim. Over the objections of Stackhouse's counsel, it confirmed that the case was a pretext case and that the jury should be recalled, informed that the previous instruction was in error, and then given an instruction and verdict form that was appropriate to a pretext case. That was done, and subsequently the jury returned a verdict for PSP. Stackhouse moved for a new trial. The District Court denied the motion.
>
> "We have reviewed the record and conclude that the confusion over this particular instruction and its correction after closing arguments did not prejudice Stackhouse. <u>The case was tried as a pretext case</u>. Stackhouse's counsel approved the incorrect charge. Although he referred to it and the corresponding verdict sheet during his closing argument, the pertinent portion of his argument was on the basis of a pretext case, not a mixed motive case. He noted that PSP contended that the 1998 test on which Stackhouse scored highest was not the sole basis for promotion, and that there were secondary criteria on the basis of which other persons, who happened to be men, were selected. Stackhouse's counsel sought to demonstrate through extensive argument that there was no reliance on secondary criteria, that, in other words, secondary criteria were a pretext for gender discrimination...." 219 Fed.Appx. at 175 (emphasis added).

The Court should follow a similar approach here and withdraw its mixed motive jury instruction and Question Nos. 2 and 3 from the verdict form. This would result in a complete verdict by the jury with respect to its unanimous answer to Question No. 1.

In this regard, it bears emphasis that under no circumstances can the Court accept a partial verdict on Question No. 1 and require a new trial as to only Question No. 2 -- this would render meaningless the "partial verdict" and create the bizarre result of rewarding Cange for the jury's rejection of her pretext case by allowing her a new trial where a new jury would only be instructed on the lesser "motivating factor" question. This is especially true as it is evident that this jury has determined Question 1 in PPA's favor and rejected Cange's pretext theory unanimously.

## **CONCLUSION.**

The Court need not and should not declare a mistrial and require a new trial. This would be legal error. The Court should either enter judgment pursuant to Rule 50, F.R.C.P., in favor of PPA, or withdraw its mixed motive charge and accept the jury's unanimous verdict on Question No. 1.

**OF COUNSEL**:
Archer & Greiner, P.C.
One Liberty Place
1650 Market Street, 32nd Floor
Philadelphia, PA  19103-7393
(215) 963-3300 (Phone)
(215) 963-9999 (Fax)

                                                Edward L. Clemniecki
                                                Patrick J. Doran
                                                  Attorneys for Defendant

5320810v4

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARIE CANGE, | : |
| Plaintiff, | : |
| v. | : CIVIL ACTION NO. 2:08-CV-3480 |
| PHILADELPHIA PARKING AUTHORITY, | : |
| Defendant. | : |

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that a true and correct copy of Defendant's Memorandum of Law in Support of Motion for Judgment was served on February 22, 2010, by hand delivery upon the following:

> May Mon Post, Esquire
> The Post Law Firm
> 1735 Market Street
> Philadelphia, PA 19103-7502
>
> Brian M. Puricelli, Esquire
> Law Offices of Brian Puricelli
> 691 Washington Crossing Road
> Newtown, PA 18940

Edward L. Ciemniecki
Patrick J. Doran
Attorneys for Defendant

**OF COUNSEL**:
Archer & Greiner, P.C.
One Liberty Place
1650 Market Street, 32nd Floor
Philadelphia, PA 19103-7393
(215) 963-3300 (Phone)
(215) 963-9999 (Fax)

5321676v1